UNITED STATES of America, Appellee,

v.

John M. ARRUDA, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Edward RINGLAND, Defendant,
Appellant.

Nos. 82–1295, 82–1297.

United States Court of Appeals,
First Circuit.

Argued April 6, 1983.

Decided Aug. 12, 1983.

Jeffrey S. Entin, Fall River, Mass., with whom Sahady, Entin & Entin, P.C., Fall River, Mass., was on brief, for John M. Arruda.

John J. Bonistalli, Boston, Mass., with whom Carhart, Bonistalli & McCarthy, Boston, Mass., was on brief, for Edward Ringland.

Amos Hugh Scott, Asst. U.S. Atty., Boston, Mass., with whom William F. Weld, U.S. Atty., Mark E. Robinson, Asst. U.S. Atty., Boston, Mass., were on brief, for appellee.

Before COFFIN and BOWNES, Circuit Judges, and TAURO,* District Judge.

BOWNES, Circuit Judge.

Defendants-appellants John Arruda and Edward Ringland were each found guilty by a jury of one count of conspiracy, 18 U.S.C. § 371,[1] and one count of violating the Travel Act, 18 U.S.C. § 1952.[2] They raise the following issues on appeal: (1) whether defendants and offenses were properly joined in one indictment and tried at one trial; (2) whether there was sufficient evidence to convict Arruda on the conspiracy and Travel Act counts and Ringland on the Travel Act count; (3) whether defendants are entitled to a new trial because two key government witnesses were in contact with each other during the trial and before one testified; (4) whether certain evidence was properly admissible against Arruda; (5) whether the trial court erred in its instructions to the jury concern-

ing multiple versus single conspiracies; (6) whether the government failed to produce *Brady* material for Ringland; and (7) whether the trial court erred in refusing to admit evidence offered by Arruda. We find no error and affirm the defendants' convictions.

The convictions stem from defendants' involvement in a scheme to obtain kickbacks from renovation work performed for the Fall River Housing Authority (FRHA). During the relevant time period Arruda served as Executive Director of the FRHA and Ringland was a Modernization Specialist at the Massachusetts Department of Community Affairs (DCA). The facts, viewed in the light most favorable to the government are as follows:

William Hammond, an engineer from New York, was interested in obtaining architectural/engineering contracts in the Fall River area. He met Owen Eagan, then the Chairperson of the FRHA, through a mutual friend in 1977. Eagan, after discussions with Joseph DiSanti, then the Assistant Executive Director of FRHA, agreed to award architectural/engineering work to Hammond in return for a kickback. An acquaintance of Hammond, Robert Olshever, agreed to become Hammond's partner for the Fall River work, and they formed Hammond Associates, Incorporated. Ol-

---

* Of the District of Massachusetts, sitting by designation.

1. 18 U.S.C. § 371 provides:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

2. 18 U.S.C. § 1952 provides in part:

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

(b) As used in this section "unlawful activity" means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics or controlled substances (as defined in section 102(6) of the Controlled Substances Act), or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

shever was to be responsible for carrying out the work in Fall River.

The first project awarded to Hammond Associates was for renovation work at FRHA's Sunset Hills housing project. In return for award of the contract, Hammond paid Eagan a total of $8,000. Hammond understood that part of this money was used to pay off "the main people" at FRHA, such as Arruda and DiSanti.[3]

In early 1978 Hammond Associates contracted with FRHA for architectural/engineering services in connection with renovation work at three FRHA housing projects. Prior to entering the contract, Hammond, Olshever, Eagan, and DiSanti agreed to a kickback arrangement, similar to the one for Sunset Hills. The work involved replacement of windows at the Maple Garden, Pleasant View, and Watuppa Heights projects, as well as siding work at Watuppa Heights. This contract was funded by DCA, and Ringland was appointed the DCA Modernization Specialist for the work. The Modernization Specialist's job was to ensure that the project progressed smoothly and that the paperwork concerning the bids and contracts entered into by FRHA complied with all legal and fiscal requirements.

Ringland met Hammond and Olshever in the spring or early summer of 1978 over lunch in Fall River. Ringland and Olshever met frequently throughout the summer to discuss the plans and specifications to be used in bidding for the window projects. The final plans and specifications were completed in August 1978 and then submitted to DCA. Olshever's final draft specified use of an A–2 window (an industry standard) and mentioned American Aluminum Window Corp.'s window as a typically acceptable window for the job. Olshever included this specific window and manufacturer at Ringland's instruction.

Before the project was open for public bidding, Ringland introduced Olshever to Michael Sullivan of A.A. Windows, a window installer, who was interested in bidding on the project. A.A. Windows purchased its windows from American Aluminum, the company Ringland directed Olshever to name in the bid specifications. Olshever showed Sullivan around the project sites, but Sullivan, it turned out, was unable to bid on the project. At that point DiSanti suggested that Olshever look for "friendly contractors." Olshever had heard that term before in conversations with Ringland and Eagan. DiSanti had defined the term as a contractor that was willing to make kickbacks.

Olshever turned to a New York acquaintance, Peter Savino, for assistance in finding a contractor for the window installation job. Savino referred Olshever to Peter Van Oss, the principal of Parkway Windows, Inc., a New York window installation company. In discussing the project with Van Oss, Olshever explained that when Parkway submitted its bid, it had to include an extra $45,000 as the architects' fee. Olshever stated that "plans for that money were that $30,000 would be going back to the Housing Authority, $2,000 was going back to Pete Savino as a finder's fee, and the balance was going to be split by [him]self and Mr. Hammond."

Olshever brought Van Oss to Fall River to see the three project sites, and thereafter they dined with DiSanti, Eagan, and Ringland. The purpose of this meeting was for these government officials to confirm that with Olshever's assistance, Van Oss "would stand a better than average chance of getting [the contract]," despite the project's being publicly bid. Olshever arranged a meeting for himself, Hammond, and Van Oss; after this meeting Van Oss agreed to submit a bid.

At a later point that August FRHA publicly advertised the bid. Shoor Elias Glass Company was interested in bidding on the contract, but wanted to use a window that differed from the one called for in the specifications. Shoor Elias contacted Olshever, and Olshever referred Shoor Elias to DiSanti. Olshever then discussed Shoor

---

3. Hammond was separately indicted for illegal activity concerning the Sunset Hills contract and was convicted on the basis of his guilty plea.

Elias' interest with DiSanti, and they agreed not to discourage Shoor Elias since it would look better to have at least one contractor in addition to Parkway bid on the work.

When the bids were opened on September 29, 1978, Shoor Elias was the low bidder at $730,000. Parkway's bid was $829,000. Acting on Hammond Associates' recommendation, FRHA disqualified Shoor Elias because the window they proposed to use did not conform to the project specifications. FRHA then voted to award the contract to Parkway.

Reacting to this turn of events, Shoor Elias filed a protest with the Massachusetts Department of Labor and Industries (DLI) alleging that Olshever had misled them into believing their proposed window was an acceptable alternative. Olshever discussed the protest with DiSanti and Ringland, and they all agreed that Olshever could best meet the allegations by filing an affidavit rebutting the claims. DLI eventually upheld the disqualification of Shoor Elias, exonerating Olshever. Eagan expressed his surprise at the results of the protest to Ringland, who replied "that Parkway owed him [Ringland] a great deal for his help that he had given Parkway in order for them to be qualified and have Shoor Elias disqualified . . . ."

Olshever learned about the DLI decision from Ringland at lunch on November 1, 1978. At that meeting Olshever informed Ringland that Parkway was interested in substituting its own window for the American Aluminum window called for in the specifications for the FRHA projects. Ringland said that this would cost Parkway an additional $25,000 and assured Olshever that the fee would cover not only this job, "but [Parkway's window] would be recommended to be put in the specs of all the other window contracts that would be coming out in the state."[4]

Olshever returned to New York that same day to report to Van Oss. Van Oss realized he was in over his head and decided that Parkway could not go through with the contract. This left Olshever in somewhat of a bind, and he immediately contacted Savino. They arranged a meeting for the following day to be attended by themselves, Hammond, and Van Oss. When Van Oss persisted in his refusal to perform under the contract, Savino, Hammond, and Olshever decided to set up another Parkway Window Corporation [Parkway II] to do the work in Fall River. They agreed that it would be Savino's corporation, and Hammond and Olshever would receive ten percent of the contract price, roughly $82,000. Olshever intended to use the $82,000 as follows: $32,000 was to go to the people at FRHA, $25,000 to Ringland, and the remainder, about $25,000, would be split between Hammond and Olshever.

On November 6, 1978, Parkway II received a certificate of incorporation from Delaware. Parkway II faced an immediate problem. It needed payment and performance bonds, which were required to be submitted to FRHA within thirty days after the contract award. These documents, along with the contract between FRHA and Parkway, had to be submitted to DCA for final approval. Unable to obtain legitimate performance and payment bonds, Olshever manufactured phony bonds in his basement in New York using facsimiles of legitimate bonds provided to him by Ringland. Olshever was assisted by William Sceviour, Savino's employee, who was to supervise the Fall River work. They also produced a new bid document to be placed in FRHA's files as a substitute for the bid submitted by Parkway I. The two then took the documents to Fall River and gave them to either DiSanti or Eagan to place in the FRHA files.

On November 22, 1978, shortly after submission of the phony documents to FRHA, Olshever obtained $5,000 in New York and traveled to Boston to meet with Ringland. He told Ringland that Parkway II had sub-

4. At the close of all evidence the court rendered its *Petrozziello* ruling and instructed the jury that Ringland's statement concerning this solicitation was part of a separate agreement and could not be used generally against all defendants. This was the only statement so limited.

mitted their bonds to FRHA and that he was not sure they could make it through the DCA review process without detection. He asked Ringland to ensure that there would be no problems and offered him $5,000. As Olshever explained,

Ringland was a little upset about that, but he said that it was like above and beyond what we had agreed upon. He wanted more money. I told him we couldn't afford it. And it had to be part of the $25,000 that we agreed upon. He had to take care of whoever he had to take care of so that it went along without any hitches.

On November 24 DCA received the FRHA's proposed contract with Parkway II and the supporting documents. These materials were routed to Ringland for fiscal and legal review on November 27, and a formal letter from DCA to FRHA approving the contract was sent on December 1. Ringland's supervisor remarked that this turn-around time was extraordinarily quick, and in fact, several documents normally required to be submitted prior to DCA approval were not received until December 11 or 14.

After the contract was approved and Parkway II began installing windows, a problem arose at the Watuppa Heights project. There was another contractor at that site, Plumb House, installing siding. Richard Anderson was the principal of Plumb House. In late January 1979 Anderson complained by letter and telegram that Parkway II was not installing the windows according to the specifications. Due to the incorrect installation, the siding could not be fitted as called for in the specifications. This meant that it would cost Anderson an additional $20,000 to make the siding compatible with the windows, and he wanted Parkway to reimburse him for that amount. Anderson discussed this problem at a meeting at the job site with Hammond, Olshever, DiSanti, Sceviour, and Harrington, the DCA Construction Engineer whose responsibilities included field inspections and construction approval at the FRHA projects. Nothing was resolved at this meeting.

Olshever, Hammond, and Sceviour rode to New York together after this meeting and discussed how to handle the problem. As Olshever explained, "[m]y concern was that it would possibly cost Parkway Windows some additional monies. And since I had a financial stake in the successful outcome of the window installation, I was concerned about that." At stake was a decrease in the amount of kickback to be received through the contract.

The three decided to explore the possibility of changing Anderson's contractual responsibilities so that he could make some additional money. A meeting was scheduled for February 5 at the FRHA offices to try to work things out with Anderson. On the morning of February 5, Arruda, DiSanti, Olshever, and Harrington had a meeting prior to Anderson's arrival. They worked out a "system" to make Anderson more cooperative. As Olshever explained, "[w]e decided to offer Anderson the opportunity to do some extra work on his siding contract.... We would make sure that the extra work had enough money in it to compensate him for the extra work that he would have to go through ...." This was to be accomplished through use of an inflated change order; compensation for the changes they asked Anderson to undertake would be greater than the cost of the changes. Olshever was chosen to present the plan to Anderson.

Upon Anderson's arrival the group went out for lunch. Attending were Anderson, Olshever, Arruda, DiSanti, Sceviour, and another FRHA employee. Several times during lunch Anderson brought up the problem at Watuppa Heights, and each time he was "put off." Anderson recalled that on four or five occasions Arruda stated that "he wanted no more telegrams, no more letters, and no more waves in Fall River." As they were leaving the restaurant, Sceviour took Anderson aside and told him "that the officials, inspectors of Department of Community Affairs, the Housing Authority, the architects and the contractors were all playing along in Fall River and that if [Anderson] would play along

also that [he] would find Fall River to be a very profitable experience."

When they returned to the FRHA offices Olshever took Anderson to a separate room and put the change order plan to him. As Anderson saw it, "[t]he thing was put in such a way by [Olshever] that no response was required." Unfortunately for the conspirators, Anderson was both astute and honest. Shortly after the meeting he contacted his lawyer and, subsequently, the Justice Department and the FBI. He agreed to play along with the scheme and assist the government in its investigation.

Work progressed on the projects throughout the winter and spring of 1979, and Sceviour began making payments to Eagan, Ringland, DiSanti, and Harrington. During April and May DiSanti and Harrington repeatedly asked Sceviour for more money from Parkway, but he said that no more money would be forthcoming. In May DiSanti proposed to Sceviour that Parkway could be given an inflated change order in return for a kickback. They agreed to a change order with $3,000 to come back. DiSanti explained that $1,000 was for himself, $1,000 for Harrington, and $1,000 for Arruda.

A formal change order was initiated on June 20, 1979, and signed by Arruda on that date. Parkway began receiving payment on the change order in September. In late September or early October Sceviour traveled from New York to Fall River to fulfill, in part, the $3,000 agreement. He brought between $2,700 and $2,800 with him, and when he arrived at FRHA he gave Harrington $200, DiSanti $1,000, and Arruda $1,000. Any further recitation of facts would be superfluous.

## I.  JOINDER AND SEVERANCE

Count 1 of the indictment charged Arruda, Eagan, Harrington, and Ringland with conspiracy, 18 U.S.C. § 371, to violate the Travel Act, 18 U.S.C. § 1952. DiSanti,[5] Hammond, Olshever, and Sceviour[6] were named as unindicted coconspirators. The indictment additionally charged Arruda, Ringland, DiSanti, Eagan, and Harrington with substantive violations of the Travel Act.[7] After Eagan and Harrington pled guilty, Arruda, Ringland, and DiSanti were jointly tried.[8] Defendants argue that the government improperly joined defendants and offenses in one indictment and trial in violation of Rule 8 of the Federal Rules of Criminal Procedure,[9] since there was not a single series of acts or transactions. They further argue that the trial court erred in failing to grant their motions under Federal

---

5.  DiSanti was not indicted as a coconspirator because the government feared possible double jeopardy implications. Olshever and DiSanti had both been indicted and had pled guilty to a charge of conspiracy to extort money from Anderson in connection with the Watuppa Heights change order. The concern was that this transaction could be interpreted as part of the overall conspiracy thereby placing DiSanti in jeopardy twice for the same conspiracy offense.

6.  Sceviour was not indicted for any crimes in connection with the FRHA transactions. He testified for the government under a grant of immunity with the condition that he testify truthfully. The government also agreed not to prosecute Savino in return for this testimony.

7.  Arruda was charged in two counts, Ringland in three, DiSanti in four, Eagan in five, and Harrington in two.

8.  DiSanti filed an appeal, but later withdrew it.

9.  Rule 8 provides:
      (a) **Joinder of Offenses.**  Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.
      (b) **Joinder of Defendants.**  Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Rule of Criminal Procedure 14 [10] for severance due to prejudicial joinder.

■ We turn first to the allegation of misjoinder under Rule 8. As we recently noted, "[t]his circuit has written at length concerning the standards applied in determining what constitutes a single 'series of acts or transactions.'" *United States v. Talavera*, 668 F.2d 625, 629 (1st Cir.1982) (citing *United States v. Luna*, 585 F.2d 1 (1st Cir.1978); *United States v. Martinez*, 479 F.2d 824 (1st Cir.1973); *King v. United States*, 355 F.2d 700 (1st Cir.1966)). That determination involves a balancing of the benefit to the government of trying together multiple defendants involved in related incidents against each defendant's right to have his own guilt considered separately. *See Talavera*, 668 F.2d at 629; *United States v. Luna*, 585 F.2d 1, 4 (1st Cir.), *cert. denied*, 439 U.S. 852, 99 S.Ct. 160, 58 L.Ed.2d 157 (1978). A conspiracy count can be a sufficient connecting link between codefendants and multiple offenses that tips the balance in favor of joinder. *See United States v. Tashjian*, 660 F.2d 829, 833 (1st Cir.), *cert. denied*, 454 U.S. 1102, 102 S.Ct. 681, 70 L.Ed.2d 646 (1981); *Luna*, 585 F.2d at 4. The count, however, must be added in good faith and, judging from the face of the indictment and the evidence adduced at trial, must have a firm basis in fact. *See United States v. Leach*, 613 F.2d 1295, 1299 (5th Cir.1980); *Luna*, 588 F.2d at 4.

■ There is little question that given the allegations in the indictment together with the facts adduced at trial joinder of defendants and offenses was appropriate here. Count 1 of the indictment alleged a conspiracy in which all of the codefendants were named as coconspirators. All of the transactions alleged in the Travel Act counts against Ringland, Arruda, and DiSanti were also listed as overt acts taken in furtherance of the conspiracy charged in Count 1. There is thus a rational basis for joinder on the face of the indictment. *See Tashjian*, 660 F.2d at 833.

Contrary to defendants' assertions, the evidence at trial clearly pointed to the existence of a single conspiracy to which all three codefendants belonged. Defendants' claims that the evidence showed multiple conspiracies with some common actors is not borne out by the record. Arruda, Ringland, and DiSanti all were aware of the general aim of the agreement; obtaining kickbacks through the award of FRHA contracts to Hammond Associates and Parkway for work at FRHA projects. They each participated in acts to further the ends of that agreement. That they did not each participate in every transaction necessary to fulfill the aim of their agreement does not transform the sequence of events into multiple conspiracies. *See Blumenthal v. United States* 332 U.S. 539, 556–57, 68 S.Ct. 248, 256–57, 92 L.Ed. 154 (1947); *United States v. Benmuhar*, 658 F.2d 14, 16 (1st Cir.1981), *cert. denied*, 457 U.S. 1117, 102 S.Ct. 2927, 73 L.Ed.2d 1328 (U.S.1982) (No. 81–1534); *United States v. Bertolotti*, 529 F.2d 149, 154 (2d Cir.1975).

Given the existence of a single conspiracy and the interrelationship between the Travel Act and conspiracy counts of the indictment, the benefits to the government of trying the defendants together are obvious. All of the evidence adduced at trial, with the exception of Ringland's solicitation of $25,000 for approval of Parkway I's substitute window, would have been admissible against each defendant in separate trials. In fact this is precisely the type of case where a joint trial is most desirable. The trial lasted for eighteen days. The evidence presented was confusing and revealed a complex scheme pervading many levels of

**10.** Rule 14 provides:

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

different companies and government organizations. In light of these circumstances, the joinder of defendants and offenses was appropriate.

■ Although defendants are properly joined, they still may seek severance under Federal Rule of Criminal Procedure 14. Rule 14 authorizes the trial court to sever counts or defendants "[i]f it appears that a defendant ... is prejudiced by a joinder ...." Fed.R.Crim.P. 14. A motion for severance is addressed to the discretion of the trial court, and to prevail defendant must make a strong showing of prejudice. *See United States v. Walker,* 706 F.2d 28 at 30 (1st Cir.1983); *United States v. Patterson,* 644 F.2d 890, 900 (1st Cir.1981); *United States v. Davis,* 623 F.2d 188, 194 (1st Cir. 1980). We review a trial court's denial of a severance motion for abuse of discretion and reverse only if denial deprived defendant of a fair trial, resulting in a miscarriage of justice. *See Davis,* 623 F.2d at 194; *United States v. Thomann,* 609 F.2d 560, 564 (1st Cir.1979).

■ Ordinarily, alleged coconspirators and the substantive offenses furthering the conspiracy may be joined together in one trial. *See Luna,* 585 F.2d at 5. Defendants contend, however, that the district court erred in failing to sever and that they suffered prejudice by joinder in the following four ways: (1) the spillover effect of evidence; (2) the existence of antagonistic defenses; (3) the loss of testimony of a codefendant; and (4) unfavorable evidentiary rulings.

■ Both Arruda and Ringland complain that their trial was unfair because they were convicted as a result of "guilt by association," rather than on the basis of independent evidence relating to their individual involvement. Arruda further argues that he was on the periphery of the conspiracy and therefore should not have been tried along with coconspirators whose guilt was established by overwhelming evidence. Resolution of this issue is governed by *United States v. Smolar,* 557 F.2d 13 (1st Cir.), *cert. denied,* 434 U.S. 866, 98 S.Ct. 203, 54

L.Ed.2d 143, 434 U.S. 966, 98 S.Ct. 508, 54 L.Ed.2d 453, 434 U.S. 971, 98 S.Ct. 523, 54 L.Ed.2d 461 (1977), in which we held that allegations identical to those raised by defendants here "are insufficient, either separately or in combination, to render denial of severance an abuse of discretion." *Id.* at 21.

As to antagonistic defenses, Arruda claims that his defense was on a collision course with DiSanti's. Arruda's theory on defense was that DiSanti ran the show at FRHA and that he was nothing more than a political figurehead who had little to do with the day-to-day operations at FRHA. Arruda claimed that DiSanti was the mastermind who plotted the details of the conspiracy by usurping all of his power at FRHA, while he stood innocently on the sidelines unaware of and uninvolved in the illegal activity.

■ The law in this circuit is well settled; " 'antagonistic defenses do not per se require severance, even if the defendants are hostile or attempt to cast the blame on each other.' " *Talavera,* 668 F.2d at 630 (quoting *Davis,* 623 F.2d at 194); *see also United States v. Fusaro,* 708 F.2d 17 at 25 (1st Cir.1983). Antagonism of defenses requires severance only where the defenses are so inconsistent that the jury would have to believe one defendant at the expense of the other; the conflict alone establishes the guilt of a defendant. *See Talavera,* 668 F.2d at 630; *Luna,* 585 F.2d at 5.

■ Arruda's defense consisted of nothing more than fingerpointing and tattling, which does not justify severance. It was not so inconsistent with any position taken by DiSanti at trial that the jury would have to find DiSanti guilty in order to acquit Arruda. Arruda's abdicating control of FRHA to DiSanti in no way compels a finding that DiSanti in fact conspired to obtain kickbacks through awards of FRHA contracts.

■ This leads to Arruda's third claim of prejudice: that DiSanti would have testified on Arruda's behalf had they been tried separately. Arruda has no evidence to sup-

port this claim. "[W]hile the availability of exculpatory testimony is an important consideration, severance is not required particularly where there has been no showing that the testimony would in fact be available upon severance, or that it would in fact be exculpatory." *Smolar,* 557 F.2d at 21.

■ Finally, both Arruda and Ringland argue that the district court's exclusion of certain evidence due to its prejudicial impact on DiSanti required severance. Arruda's claim refers to the trial court's refusal to admit a portion of a United States Department of Housing and Urban Development report. The report confirmed Arruda's theory that DiSanti had assumed control over FRHA operations. As Arruda admits in his brief before this court, this theory was not disputed by anyone at trial, and in fact, all of the government's evidence pointed to this conclusion. The district court's refusal to admit the report, therefore, was not significantly prejudicial to defendant and does not indicate an abuse of discretion in the court's refusal to grant severance.

Ringland's claim is a bit more complicated. Some background information is necessary. Olshever and DiSanti were charged in a separate indictment with conspiring to extort money from Anderson (Plumb House). The extortion occurred in connection with the change order used to ensure Anderson's cooperation at the Watuppa Heights project. Olshever and DiSanti both were convicted on the basis of guilty pleas, and Olshever began giving information to the government in accord with his plea bargain.

Ringland wanted to impeach Olshever by showing that Olshever, to have a bargaining chip with the government in the case concerning Parkway, fabricated his testimony against Ringland. According to Ringland, Olshever knew that the government had sufficient evidence to convict DiSanti for his involvement in Parkway. Thus, Olshever had to implicate someone else so that the government would be willing to allow him to be a witness rather than a defendant. He chose Ringland. Ringland argued

that to establish fully Olshever's motive for testifying, he had to reveal DiSanti's prior conviction with Olshever in the extortion case.

The conflict is obvious. DiSanti did not want his prior conviction revealed to the jury. The trial court considered severance at this point, but wanted Ringland to show that there was some basis in fact for his theory. The court thus allowed all counsel to conduct an extensive voir dire of Olshever to identify his motive for testifying and determine whether Ringland's theory was plausible.

The testimony elicited on voir dire undercut Ringland's theory. Olshever denied "delivering" Ringland to the government. He indicated that he did not know the government had anything on DiSanti in connection with Parkway. In fact, the evidence showed that as late as six months after Olshever began cooperating with the government, he divulged information that formed the basis for a separate Travel Act count against DiSanti. There was thus no basis in fact for Ringland's theory.

■ Under these circumstances, there was no error in the district court's refusal to allow Ringland to introduce DiSanti's prior conviction through Olshever. We see no merit in Ringland's argument that the court's actions unduly restricted his constitutional right to impeach the credibility of a government witness on cross-examination. *See Davis v. Alaska,* 415 U.S. 308, 316–17, 94 S.Ct. 1105, 1110–11, 39 L.Ed.2d 347 (1974). Ringland had abundant opportunity to expose Olshever's motive for testifying and to impeach his character generally. The only restriction imposed by the district court was that Ringland could not ask Olshever about DiSanti's prior conviction. Under these circumstances, the court did not deny defendant "the constitutionally required threshold level of inquiry" into a government witness' motivation for testifying. *See United States v. Tracey,* 675 F.2d 433, 437 (1st Cir.1982). The issue is whether the trial court abused its discretion, *see id.,* and we hold that it did not.

There was no error in the trial court's refusal to grant severance.

## II. SUFFICIENCY OF THE EVIDENCE

Both Ringland and Arruda challenge the sufficiency of the evidence supporting their convictions. Ringland objects only to his conviction on the Travel Act count, while Arruda challenges both his Travel Act and conspiracy convictions. In addressing these issues

we regard the evidence, including all inferences that may reasonably be drawn therefrom, in the light most favorable to the government. *United States v. Fortes,* 619 F.2d 108, 122 (1st Cir.1980). We must determine whether a reasonable jury, so viewing the evidence, could find guilt beyond a reasonable doubt. *Id.* The evidence need not exclude every reasonable hypothesis of innocence, *United States v. Smith,* 680 F.2d 255, 259 (1st Cir.1982), *cert. denied* [—— U.S. ——] 103 S.Ct. 738 [74 L.Ed.2d 960] (1983), and if it can support varying reasonable interpretations, the jury is entitled to choose among them, *United States v. Klein,* 522 F.2d 296, 302 (1st Cir.1975).

*United States v. Quejada-Zurique,* 708 F.2d 857 at 859 (1st Cir.1983).

To establish a violation of the Travel Act, 18 U.S.C. § 1952, the government must prove: (1) interstate travel or the use of an interstate facility; (2) with the intent to distribute the proceeds of or otherwise promote, manage, establish, carry on, or facilitate an unlawful activity; (3) followed by performance, or attempted performance of acts in furtherance of the unlawful activity. *Id.; see United States v. Coran,* 589 F.2d 70, 72 (1st Cir.1978).

Bribery in violation of state law is an unlawful activity within the meaning of the Travel Act, *see* 18 U.S.C. § 1952(b)(2), and the Massachusetts bribery statute, Mass.Gen.Laws Ann. ch. 268A, § 2, is thus a sufficient predicate crime under the Travel Act. *See United States v. Hathaway,* 534 F.2d 386, 398 (1st Cir.), *cert. denied,* 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976). Section 2(b) of the Massachusetts law pro-

hibits any state, county or municipal employee from engaging in bribery to influence performance of an official act. Mass. Gen.Laws Ann. ch. 268A, § 2(b); *see Hathaway,* 534 F.2d at 399. To obtain a conviction under this section the government "must show a corrupt intent on the part of the defendant to be influenced in his future performance of an official act." *Commonwealth v. Dutney,* 4 Mass.App. 363, 348 N.E.2d 812, 821 (1976).

The Travel Act count against Ringland charged him with causing Olshever to travel interstate for the purpose of delivering $5,000 to Ringland as part of an illegal bribery scheme. He challenges his conviction on this count on three grounds: (1) that the government failed to show that he violated the Massachusetts statute; (2) that any travel was incidental to the commission of the bribery; and (3) that he performed no overt act in furtherance of the unlawful activity after the traveling occurred. We reject all three arguments.

As to the bribery claim, Ringland argues that he was not influenced in the performance of any official duty and, at most, he extorted money from Olshever. He claims that he solicited $25,000 from Olshever in return for approval of Parkway I's substitute window. And since Parkway I backed out of the contract, no window was ever submitted for him to approve. This contention founders on the evidence and the law.

Ringland ignores the fact that his conviction is based on the $5,000 he received from Olshever on November 22, 1978, in return for Ringland's assurance that Parkway II's phony bid and bond documents would pass smoothly through the DCA's review process. Olshever testified that Ringland accepted $5,000 for this purpose. The additional testimony by Ringland's supervisor, that Parkway II's review was completed in record time, indicates that Ringland made good on his promise.

Nor are we persuaded that Olshever's travel from New York to Boston in connection with the $5,000 bribe was incidental. "There is 'no requirement that the use of

the interstate facilities be essential to the scheme: it is enough that the interstate travel or the use of interstate facilities makes easier or facilities the unlawful activity.'" *United States v. Wander,* 601 F.2d 1251, 1256 (3d Cir.1979) (quoting *United States v. Perrin,* 580 F.2d 730, 736 (5th Cir.1978)). Travel is not incidental if it is "an important link in the interchange" among defendants. *Hathaway,* 534 F.2d at 398. The evidence presented warranted a jury finding that travel between New York and Boston was "an important link" in the payment of kickbacks by Olshever to Ringland. Hammond Associates, Olshever's company, was a New York business, and any money flowing to Ringland through Hammond would have to originate in New York. Olshever's testimony that he told Ringland that the $5,000 would have to be part of the $25,000 upon which the two had previously agreed indicates that Ringland contemplated payment to him of $25,000 cleared through Hammond in New York. This is sufficient to show that Ringland caused interstate travel within the meaning of the Travel Act.

■ Finally, there was sufficient evidence to allow the jury to find that Ringland performed an act in furtherance of the bribery after Olshever's interstate travel. As explained above the evidence showed that Ringland fulfilled his part of the bargain by facilitating the smooth passage of Parkway II's contract documents through the DCA's review process. Furthermore, it seems obvious that Ringland's mere acceptance of the money was a sufficient overt act following the travel; acceptance is an act taken in furtherance of the distribution of the proceeds of an unlawful bribery scheme.

Arruda, too, challenges his Travel Act conviction. The count against Arruda alleged that he caused Sceviour to travel interstate for the purpose of delivering $1,000 to Arruda as part of an illegal bribery scheme. Arruda's arguments, similar to those raised by Ringland, are as follows: (1) that the government did not prove bribery under Massachusetts law; (2) that Sceviour's travel was incidental; and (3) that he did not cause Sceviour to travel.

Arruda's first argument is entirely devoid of merit. He contends that even if he received $1,000 from Sceviour, a fact that is sufficiently supported by the record, there was no bribe since he did not "do a corrupt or illegal act in return for the $1,000"; he did nothing "except perform his normal lawful duties." Arruda overlooks that this is exactly what a bribery scheme under Massachusetts law involves; a corrupt intent to accept money in return for the performance of an official act. The bargained for action is not supposed to be corrupt or illegal; the corrupt acceptance of money in return for that which is a public official's duty is the forbidden action.

The evidence amply supported the jury's conclusion that Arruda, with a corrupt intent, accepted $1,000 in exchange for approving a change order for Parkway windows. Sceviour testified about the agreement to kickback $1,000 apiece to Arruda, DiSanti, and Harrington in return for a change order. Arruda signed the change order on June 20, 1979, and Sceviour testified that he thereafter traveled from New York to Fall River with money to pay off the bribes. Sceviour stated that when he went to Arruda's office at FRHA Arruda asked, "Did you bring my money for me?" Sceviour said that he responded, "Yes, I brought a thousand dollars for you," and Arruda took the money from him. The jury could conclude that Arruda corruptly intended to perform his official duties, the signing of a change order, in return for $1,000.

We also cannot accept Arruda's claims that the travel was incidental and that he did not cause the travel. Our disposition with regard to Ringland's similar claims applies with full force here. The evidence showed that Arruda solicited kickbacks from a company with its main operations in New York, and the jury could find that Arruda knew that money flowing to him would originate in Parkway II's New York office.

■ Arruda challenges his conspiracy count conviction on the ground that the

government did not prove that he was a member of the conspiracy. We disagree. There was sufficient evidence from which the jury could find that Arruda was a participant in a scheme to obtain kickbacks through the award of FRHA contracts.

As recounted above, Sceviour testified that Arruda participated in a scheme to obtain $3,000 in return for a change order. Anderson, Sceviour, and Olshever each implicated Arruda in the scheme to make Anderson (Plumb House) more cooperative by offering to give him an inflated change order. The evidence placed Arruda at a meeting at which the scheme was devised and at a luncheon where he and the others tried to ensure that Anderson would agree to the change order.

Arruda claims that the government failed to penetrate his defense that he stood on the sidelines at FRHA without knowledge of the illegal activity while DiSanti took the reins of power from him. The evidence indicated that Arruda was indeed a figurehead and did not play a significant role at FRHA. But the evidence also warranted a jury conclusion that Arruda intentionally kept his involvement at a minimum with the full expectation that he would get his cut of the deal.

Olshever testified that at a luncheon meeting with Arruda on November 8, 1979, Arruda told him "that some of the people he [Arruda] worked with used to take him as a fool because he kept quiet about a lot of things, but he knew exactly what was going on." According to Olshever, Arruda told him that he was concerned because he did not think he was getting "his fair share" from DiSanti. Arruda and DiSanti had "numerous deals that were in progress," but Arruda "felt he was being cut out by Joe." This evidence provides ample basis for a jury determination that Arruda conspired with the other named co-conspirators to violate the Travel Act.

## III. PERJURY AND BREACH OF SEQUESTRATION ORDER BY GOVERNMENT WITNESSES

Arruda and Ringland both moved for mistrial or the exclusion of Olshever's and Sceviour's testimony. They argue that these two witnesses violated the court's sequestration order and met during trial to discuss testimony. They further allege perjury on the part of Sceviour or Olshever, or both, since each gave differing testimony regarding the frequency of their meetings and the substance of their conversations.

At trial, Sceviour testified on cross-examination that he met with Olshever about five or six times during the course of the trial. He stated, however, that he did not discuss his testimony with Olshever or Olshever's testimony. They did, however, have some discussions about the case. Sceviour related the substance of those conversations to the jury.

Olshever had earlier testified that he saw Sceviour two or three times but did not discuss the case with him. As a result of Sceviour's revelations, Olshever was recalled for extensive voir dire by all counsel. He held to his earlier testimony that he and Sceviour did not discuss the case. Olshever was then recalled for direct examination by defense counsel. He was questioned extensively about his meetings and conversations with Sceviour. He stated that he and Sceviour met and conversed about six times. His recollection of the content of the conversations differed substantially from Sceviour's.

The trial court denied defendants' motion for exclusion of these witnesses' testimony and a mistrial. It stated:

Well, the thing is that it is all revealed, that it's all out, and it's open to you to argue it and up to the jury to decide it, usable information in Sceviour's testimony. I don't think that every time that a government witness gets caught in perjury there's a mistrial. I think the rule is that if the government puts a person on the stand knowing that he's about to commit perjury or colludes in the perjury in any way, that that's grounds for mistrial, not necessarily because the trial is fatally infected, but simply as a disciplinary and prophylatic move by the Court

to keep the Government prosecutors on the straight and narrow. But it doesn't appear that Mr. Scott [the United States Attorney] has deviated from the straight and narrow. Certainly well persuaded that Mr. Olshever has, but I don't think that that is a ground for mistrial where it is fully exposed.

■ We think the trial court ruled correctly on this issue. Where there is no evidence that the government acted in bad faith or intentionally attempted to introduce false testimony, and the perjury is fully exposed to the jury, it is not error to deny a motion for mistrial. *See United States v. Burreson,* 643 F.2d 1344, 1350 (9th Cir.), *cert. denied,* 454 U.S. 830, 102 S.Ct. 125, 70 L.Ed.2d 106, 454 U.S. 847, 102 S.Ct. 165, 70 L.Ed.2d 135 (1981); *Braxton v. Estelle,* 641 F.2d 392, 395 (5th Cir.1981).

As to the violation of the sequestration order, we again find no error. On the first day of trial the court ordered all witnesses to remain outside the courtroom during trial. The government is technically correct in its argument that Olshever and Sceviour did not violate this order since neither was present in the courtroom while the trial was in progress. Sceviour's and Olshever's meeting, however, had the same potential effect as a violation of a sequestration order—exposure to testimony prior to being called as a witness. We therefore think it appropriate to treat their meetings as breach of a court order. *See United States ex rel. Clark v. Fike,* 538 F.2d 750, 757 (7th Cir.1976), *cert. denied,* 429 U.S. 1064, 97 S.Ct. 791, 50 L.Ed.2d 781 (1977).

■ It is well settled that breach of a sequestration order does not automatically disqualify a witness from rendering testimony; the appropriate sanction is left to the sound discretion of the district court. *See, e.g., United States v. Bizzard,* 674 F.2d 1382, 1388–89 (11th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 305, 74 L.Ed.2d 286 (1982); *United States v. Nelson,* 603 F.2d 42, 47 (8th Cir.1979); *United States v. Oropeza,* 564 F.2d 316, 326 (9th Cir.1977), *cert. denied,* 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 788 (1978); *Fike,* 538 F.2d at 757.

There was no abuse of discretion here. According to Sceviour, his discussions with Olshever did not relate to any critical issues in the case. Furthermore, the trial court was correct in observing that Olshever's and Sceviour's testimony conflicted in many respects, thereby supporting Sceviour's testimony that their conversations did not relate to the trial in any significant way. Finally, as discussed above, these meetings were fully revealed to the jury and used to impeach the credibility of both Olshever and Sceviour. The trial court was correct in leaving this as a credibility issue for the jury.

## IV. ADMISSIBILITY OF PORTIONS OF SCEVIOUR'S TESTIMONY

Arruda challenges the admissibility of Sceviour's testimony that DiSanti told him that Arruda was to get $1,000. Arruda's basic objection is to the correctness of the trial court's ruling under *United States v. Petrozziello,* 548 F.2d 20 (1st Cir.1977).

■ In *Petrozziello* we enunciated a standard for the district courts to use in applying the coconspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E). "The ordinary civil standard is sufficient: if it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy, the hearsay is admissible." *Petrozziello,* 548 F.2d at 23. The court is to make this determination at the close of all evidence. *See United States v. Ciampaglia,* 628 F.2d 632, 638 (1st Cir.), *cert. denied,* 449 U.S. 956, 101 S.Ct. 365, 66 L.Ed.2d 221, 449 U.S. 1038, 101 S.Ct. 618, 66 L.Ed.2d 501 (1980). In reviewing a trial court's *Petrozziello* ruling we must accept that court's findings of fact supporting the ruling unless they are clearly erroneous. *See Patterson,* 644 F.2d at 894.

■ We see no error in the district court's findings. There is no need to again recite the relevant facts in detail. Suffice it to say that there was sufficient evidence to support the district court's finding that

DiSanti's statement that Arruda was to get $1,000 in return for a change order was intimately connected to and in furtherance of the scheme to receive kickbacks through award of FRHA contracts.[11]

There is no merit to Arruda's additional claim that Sceviour's testimony concerning his transactions with Harrington were not admissible against him. He argues that he was not involved with Harrington, and therefore this was a separate conspiracy. The evidence points to the opposite conclusion. Arruda and Harrington were both present at the FRHA meeting when the scheme to placate Anderson with a change order was concocted. Also, Harrington was the third payee on the change order DiSanti negotiated with Sceviour through which Arruda received $1,000. That Arruda was not aware of Harrington's receipt of money "to speed up payment requisitions at the Department of Community Affairs" does not change our conclusion. The rule is, as already stated, that a coconspirator need not know all the details of and participants in the conspiracy as long as he or she is aware of its essential features and general aims. *See Blumenthal,* 332 U.S. at 556–57, 68 S.Ct. at 256–57; *United States v. Stubbert,* 655 F.2d 453, 456 (1st Cir.1981).

## V. OTHER ISSUES

We see little merit to defendants' remaining arguments and dispose of them summarily.

*Jury Instructions.* Arruda claims that the trial court erred in failing to instruct the jury specifically on the issue of multiple conspiracies. Because Arruda failed to raise this objection at trial, he must establish that the instructions given were plainly erroneous. *See Fusaro,* 708 F.2d 17 at 22. We find no error. The instructions clearly and thoroughly stated the applicable standard by which the jury should consider defendant's participation in a conspiracy.

*Brady Material.* Ringland claims the government failed to deliver certain exculpatory evidence to him. The government did provide him with one of the documents which he claims was suppressed. As to the remaining material, Ringland has not made clear to what he is referring or its exculpatory value.

*HUD Report.* We dealt largely with this claim above in our discussion of prejudicial joinder. *See supra* at 26. We reiterate that the report, which stated that DiSanti had taken control at FRHA, was cumulative on a point not contested by the government. The trial court did not err in excluding it on the ground that its prejudicial impact on DiSanti far outweighed its probative value to Arruda.

*The convictions are affirmed.*

---

11. Arruda additionally claims that DiSanti's statement was a confession of a coconspirator, and its admission without opportunity for cross-examination of DiSanti violates the rule of *United States v. Bruton,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Since, however, DiSanti's statement falls within the coconspirator exception to the hearsay rule, there is no *Bruton* problem. *See Dutton v. Evans,* 400 U.S. 74, 80–83, 91 S.Ct. 210, 215–217, 27 L.Ed.2d 213 (1970) (plurality opinion); *United States v. DiGregorio,* 605 F.2d 1184, 1189–90 (1st Cir.), *cert. denied,* 444 U.S. 937, 100 S.Ct. 287, 62 L.Ed.2d 197, 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 312, 444 U.S. 983, 100 S.Ct. 489, 62 L.Ed.2d 411 (1979).