**UNITED STATES of America,**

v.

**Ali OSSEIRAN, Michael Fisher.**

**Crim. No. 90–10020–Y.**

United States District Court,
D. Massachusetts.

July 16, 1992.

Robert A. George, Balliro, Mondano & Balliro, Richard M. Egbert, John C. McBride, Boston, Mass., Anthony Traini, Randolph, Mass., for defendants.

Clayton Spencer, U.S. Atty., Boston, Mass., for U.S.

## MEMORANDUM

YOUNG, District Judge.

After an extensive undercover investigation, government authorities set up a "reverse sting" operation involving Ali Osseiran. Acting in accordance with a plan agreed to by Osseiran, government agents met Osseiran's courier, one Michael Haloui, at Logan Airport, matched separate halves of a torn dollar bill, and then turned over to Haloui containers of what purported to be illicit drugs but what were, in fact, actually flour. Once Haloui had walked a short distance carrying the "drugs," he was arrested. Meanwhile, in downtown Boston, Osseiran was paying for the "drug" shipment with finely-cut diamonds—which turned out to be glass. Osseiran was likewise arrested by government agents.

Back at the airport, Haloui—deeming full cooperation the better part of valor—revealed that his instructions from Osseiran directed him to deliver the package of alleged contraband to an individual at a liquor store in East Boston. The agents determined, therefore, to make a "controlled delivery" to see who else they might nab. Unfortunately, they lost precious time trying to rent an unmarked car in which to drive Haloui to the delivery point. When they finally arrived at the liquor store, Michael Fisher was waiting but, as he had been making a series of increasingly nervous calls to Osseiran's diamond emporium, he was forewarned and refused to take delivery from Haloui.

In due course, Haloui and Osseiran were indicted for attempting and conspiring to possess with intent to distribute more than five kilograms of cocaine and more than one kilogram of heroin in violation of 21 U.S.C. § 846 (1988). Fisher was similarly indicted with respect to cocaine only. Claiming he had no knowledge of the con-

tents of the container he was sent to pick up, Haloui was put to trial first and acquitted. Thereafter, when it became clear that Osseiran would raise an entrapment defense, Fisher—denying any involvement with him—moved for a severance but this Court denied the motion.

At their joint trial, Osseiran's counsel vigorously cross-examined the government's hired confidential informants—themselves former drug dealers from Pakistan—especially one Aziz Malik. Mid-way through the case in chief, however, Osseiran struck a bargain with the government, agreeing to plead guilty in return for the recommendation of a three year sentence and a promise that the government would not call him to testify against Fisher. The Court accepted Osseiran's plea on October 10, 1990. Fisher did not move for a mistrial and, after six more days of trial, he was convicted of all charges on October 16, 1990.

The trial, while factually interesting, is legally unremarkable. It is the post-trial proceedings that require written analysis.

### A. Post–Trial Proceedings: Osseiran

The government's recommendation of a three year sentence for Osseiran is substantially below the applicable sentencing guidelines range of 151 to 188 months (12 years 7 months to 15 years 8 months). U.S. Sentencing Commission, *Guidelines Manual* ("U.S.S.G.") Ch. 5, Pt. A, Sentencing Table (offense level 34; criminal history category I) (Nov. 1991); (Presentence Report, February 14, 1991, at 8–9; Disposition Tr., February 20, 1991, at 31). The government justified this proposed downward departure at the time of Osseiran's plea not on the ground that Osseiran was going to provide "substantial assistance" to it, *see* U.S.S.G. § 5K1.1—after all, the

government expressly promised that it would not call Osseiran as a witness against Fisher—but rather on the fact that "coercion" had played some part in Osseiran's crimes, *see* U.S.S.G. § 5K2.12.[1] *See generally United States v. Connell*, 960 F.2d 191, 196–97 (1st Cir.1992) (discussing "sentencing factor manipulation").

Such a recommendation is a rather remarkable expansion of section 5K2.12 and, indeed, makes this case one of first impression in this Circuit since the "coercion" justifying the downward departure arises not from the conduct of any of Osseiran's confederates, charged or uncharged. *Compare United States v. Amparo*, 961 F.2d 288, 291–292, (1st Cir.1992) (appellant sought downward departure based on coercive threats by confederates); *United States v. Harotunian*, 920 F.2d 1040, 1044, 1046 (1st Cir.1990) (same). In contrast, mitigating "coercion" here arises from the threatening role of the government's own well-paid confidential informant who was a central figure in organizing the narcotics transaction to which Osseiran offered to plead guilty. Recognizing the anomalous nature of the government's recommendation, the Court explicitly pointed out that if the government urged such an expansive view of section 5K2.12 upon the Court in order to obtain Osseiran's plea, it would later be judicially estopped from reverting to a narrow construction in like circumstances when another defendant sought a downward departure upon identical grounds. After careful consideration, the government agreed. (Disposition Tr., February 20, 1991, at 32–35.)

Accordingly, this Court turned to a consideration of whether, both legally and factually, a downward departure pursuant to

---

1. § 5K2.12 *Coercion and Duress* (Policy Statement)

   If the defendant committed the offense because of serious coercion, blackmail or duress, under circumstances not amounting to a complete defense, the court may decrease the sentence below the applicable guideline range. The extent of the decrease ordinarily should depend on the reasonableness of the defendant's actions and on the extent to which the conduct would have been less harmful under the circumstances as the defendant believed them to be. Ordinarily coercion will be sufficiently serious to warrant departure only when it involves a threat of physical injury, substantial damage to property or similar injury resulting from the unlawful action of a third party or from a natural emergency.

section 5K2.12 was authorized due to the government's "coercion" of Osseiran.[2]

Guideline section 5K2.12 distinguishes "coercion" as a defense to prosecution from "coercion" as a mitigating factor in sentencing, since the latter can be based upon "circumstances not amounting to a complete defense." *See e.g., Amparo*, 961 F.2d at 292. The distinction between these forms of coercion has long been unmistakable at common law.

■ Defendants who raise "coercion" as a shield against prosecution must proffer evidence sufficient to meet three objective tests, i.e., that their violation of law was compelled by threats which were immediate, grave, and inescapable. *United States v. Contento–Pachon*, 723 F.2d 691, 693 (9th Cir.1984). Only such a proffer on all three aspects of duress compels the trial judge to give a particularized jury instruction under this defense. *See United States v. Feldhacker*, 820 F.2d 279, 280 (8th Cir. 1987).

■ The First Circuit, in accord with this general tripartite standard, requires defendants offering coercion as an excuse to show the compulsion to be "present, immediate, and impending, and of such a nature as to induce a well-founded fear of death or at least serious bodily injury. And there must be no reasonable opportunity to escape the compulsion without committing the crime." *Rhode Island Recreation Center, Inc. v. Aetna Casualty & Surety,*

177 F.2d 603, 605 (1st Cir.1949).[3] A defendant will not prevail if his own recklessness placed him where coercive threats were probable. *United States v. Wheeler*, 800 F.2d 100, 107 (7th Cir.1986); *United States v. Gant*, 691 F.2d 1159, 1162–63 (5th Cir. 1982). *Accord Commonwealth v. Robinson*, 382 Mass. 189, 199–200, 415 N.E.2d 805 (1981).

■ By contrast, the defendant who argues that coercion should mitigate punishment faces no such daunting obligations under the guidelines. Mitigation of sentence can be appropriate where threats impacting on a defendant are neither grave, immediate, nor inescapable. The guidelines encompass as potentially "coercive" threats which only amount to blackmail or "substantial" menace to property. U.S.S.G. § 5K2.12. The subjective fearfulness of a particular defendant who wrongly believes himself compelled by such a threat to act unlawfully may be sufficient to show coercion for sentencing purposes.

Mindful of these distinctions, the Third Circuit vacated and remanded a decision by a district judge who reluctantly refused to consider a downward departure urged on coercion grounds because the jury had rejected coercion as a trial defense. *United States v. Cheape*, 889 F.2d 477, 478–79 (3d Cir.1989).[4] The refusal was considered understandable but wrong, since "[i]f section 5K2.12 is to be accorded meaningful status, ... we must read it as providing a broader

**2.** It is the practice of this Court, at the time of the taking of a plea, to disclose to a defendant its then-present intention—should any such intention then exist—of exceeding the government's recommendation with respect to the proposed period of incarceration. I do this as a matter of simple fairness. *See United States v. Byrne*, No. 90–10269, slip op. at 3–5 (D.Mass. November 22, 1991).

**3.** The requirement of *Rhode Island Recreation Center* that there be no reasonable legal alternative to violating the law that would also avoid the threatened harm has been cited with approval in *United States v. Bailey*, 444 U.S. 394, 410 n. 8, 100 S.Ct. 624, 635 n. 8, 62 L.Ed.2d 575 (1980) and *United States v. Alicea*, 837 F.2d 103, 107 (2d Cir.1988).

**4.** Karen Klinefelter argued at trial that she was forced by her co-defendants, Johnson (also her boyfriend) and Cheape, to remain in the geta-

way car while the co-defendants robbed a bank. The district judge, in denying Klinefelter's request for a downward departure from the guidelines sentencing range, opined:

> I feel the Court has no choice. Personally I believe Ms. Klinefelter was taken advantage of by her co-defendants, although I must disagree with the position that she was coerced or forced into this situation.
>
> ·... This case cries out for justice to be tempered with mercy.
>
> ... I believe the Court should not have its hands completely tied in a situation like this.... I hope either the Congress or the Sentencing Commission or both will consider giving judges a bit more leeway in cases such as that of Karen Klinefelter.

*Cheape*, 889 F.2d at 478–79.

standard of coercion as a sentencing factor than coercion as required to prove a complete defense at trial.... [The guidelines do] not require proof of immediacy or inability to escape...." *Id.* at 480.

The relaxation of the coercion trial defense standard for sentencing purposes does not mean that defendants seeking downward departure need only voice their sensibility of duress in committing crimes. The bare claim by a driver that he carried out cocaine delivery instructions only because he "would have suffered the wrath of his co-conspirators" had he declined was insufficient to show duress under section 5K2.12 of the guidelines where the proffered evidence did not show that threats of a sufficiently serious nature were made. *United States v. McCrary,* 887 F.2d 485, 488–89 (4th Cir.1989).

The First Circuit sharpened the limits of coercion under the guidelines by vacating and remanding a downward departure in the sentencing of Susan Pozzy, who was convicted of cocaine trafficking along with her husband. *United States v. Pozzy,* 902 F.2d 133, 137–39 (1st Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 353, 112 L.Ed.2d 316 (1990). The district court sentenced Ms. Pozzy below the guidelines range upon a finding of duress, finding *inter alia* that "she got into this matter because she loved her husband and because he had a drug habit, and he wanted her to do it, and she really had no alternative but to leave or stay there and participate." *Id.* at 137. The First Circuit rejected this subjective conception of duress and insisted upon substantive evidence of a relationship between some actual threat and the defendant's drug trafficking activities, noting, "[t]here is nothing in the record to suggest that defendant was physically coerced by her husband ... or [acted] ... because of threats of physical violence.... [or] that defendant's husband led her against her will into a life of crime." *Id.* at 139; *cf. Harotunian,* 920 F.2d at 1046 (degree of upward departure was reasonable where district court considered coercion as a miti-

gating factor and found no threat of physical harm).

■ The presence of coercion as a mitigating factor in the instant case does not depend upon the credibility of the defendant's subjective perceptions of the relationship of the threat to the necessity of unlawful conduct. There is considerable testimony regarding actual duress in the record, quite apart from the government's express recognition of this consideration in the plea agreement and in its promised recommendation of the three year sentence.

Here, the claim of duress prescinds from the conduct of a confidential informant for the federal Drug Enforcement Agency ("DEA"), one Aziz Malik ("Malik"). It was Malik, himself a convicted narcotics dealer who began service as an informant after an arrest by federal agents, who first approached Osseiran, offering to provide large amounts of cocaine and heroin in what ultimately promised to be a $1.3 million drug deal featuring Osseiran as the major financier.

The government acknowledges that Malik, acting as an informant, had arranged a number of narcotics stings prior to the operation which ended in Osseiran's arrest. He was paid some $129,000 for his services in such operations during 1990. The arrangement between Malik and the DEA also entitled Malik to 15% of the value of all goods and money seized by the government in forfeiture proceedings following narcotics arrests in stings arranged by Malik, an arrangement which extends to proceeds from any forfeiture of Osseiran's goods in this case.

Malik testified to a series of statements he made to induce Osseiran to complete this large-scale narcotics purchase. It appears that Malik told Osseiran on several occasions that he, Malik, would be shot and killed at some future time by unspecified dangerous drug dealers if the transaction involving Osseiran fell through.[5] It is less

---

5. Excerpts from the relevant testimony are as follows:

Q. Well, in any event, when you met Mr. Osseiran on November 21st, do you recall

certain whether or not Malik also told Osseiran that he, Osseiran, would also be killed if the drug deal went sour.[6]

The content of Malik's statements would be insufficient to excuse Osseiran's criminal conduct since they amount to no more than a "veiled threat of future unspecified harm." *Rhode Island Recreation Center,* 177 F.2d at 605. Such vaguely menacing warnings do, however, come within the guideline definition of coercion as "a threat of physical injury . . . resulting from the unlawful action of a third party." U.S.S.G. § 5K2.12.

The timing and acknowledged purpose of Malik's feigned fears of assassination by drug dealers also support a finding of coercion. Malik pressed his fears upon Osseiran at several moments when the latter hesitated in the drug deal, and Malik clearly intended that the "dealers'" threats would spur Osseiran to gather his assets to complete the transaction. It is also significant that Malik was a practiced actor in such sting operations and was formerly an active drug dealer.

This Court concludes that the evidence here supports a finding of coercion as a mitigating factor under section 5K2.12 of the guidelines based on the content and timing of Malik's feigned death threats.

After finding the presence of the mitigating factor of coercion in this case, this Court has broad discretion to determine the appropriate degree of downward departure from the guidelines sentencing range. *United States v. Aguilar–Pena,* 887 F.2d 347, 350 (1st Cir.1989). The guidelines specify that the "[e]xtent of the [sentence] decrease ordinarily should depend upon the *reasonableness* of the defendant's actions and on the extent to which the [defendant's unlawful] conduct would have been less harmful under the circumstances as the defendant *believed* them to be." U.S.S.G. § 5K2.12 (emphasis added). Malik's timing and intent in conveying his well-practiced threats to Osseiran are certainly germane both to an evaluation of the "reasonableness" of Osseiran's conduct and Osseiran's belief that the circumstances made completion of the drug transaction "less harmful" than his acceptance of Malik's death, and perhaps his own.

In Osseiran's case, the degree of departure for "coercion" under guidelines section 5K2.12 is guided by the Court's view of the *reasonableness* of Osseiran's going through with the narcotics transaction and his subjective *belief* in the necessity of such conduct to prevent a greater harm—

---

saying to him, "My life is on the line, Ali"? . . . . Do you recall saying those words?

. . . .

A. Might have said it, but not [sic], I won't confidently say yes, I said it.
(Trial Tr., September 26, 1990, Malik Test., Vol. 6, at 33.)
Q. How many times did you say to Ali, ["]these guys, I got to get them off my back?["] How many times did you say that to Ali?
A. A few times.

. . . .

Q. You said ["]I want them off my back because they'll shoot me otherwise,["] didn't you tell him that?

. . . .

A. I don't think so. But I might have. . . . I don't think I used the word shoot me.

. . . .

Q. Then do you recall saying to him. . . . ["]I do not want to get shot.["]

. . . .

A. Of course. That is simple, but I didn't say that they will shoot me.
Q. Who did you not want to get shot by?
A. Anybody that I made a big goof up.

(Trial Tr., Sept. 26, 1990, Malik Test., Vol. 6, at 37–39.)

**6.** Malik's statements to this effect appear on tape recording "N–3" made surreptitiously by the DEA on November 21, 1989, in the course of their investigation and sting operation against Osseiran.

In addition, the following excerpts from Malik's trial testimony are germane:
Q. And you said not only will you die but Ali will die?
A. If he owes me a million dollars and maybe I owe somebody else a million dollars, what do you expect?
(Trial Tr., September 26, 1990, Malik Test., Vol. 6, at 39.)
Q. Then you die and he dies, that's what you are trying to tell him?
A. If I will go and tell the drugs sellers that he stole the money from me, of course they would go and kill him off if they were ready to kill me. I'm portraying to be a drug dealer, not a, I mean, jewelry or real estate dealer at that time.
(Trial Tr., September 26, 1990, Malik Test., Vol. 6, at 45.)

Malik's death, and perhaps his own, at the hands of frustrated drug dealers. In sum, there was ample evidence to support the recommended downward departure from the guidelines range to a three-year sentence.

The propriety of the recommended downward departure having apparently been fully plumbed at the time of taking Osseiran's plea, the Court returned to completing the trial of Fisher alone. While Osseiran was awaiting sentencing, the probation officer assigned to prepare Osseiran's pre-sentence investigation pointed out to the parties and the Court that the recommended sentence was wholly unlawful in that, whatever the propriety of a downward departure pursuant to the guidelines, the offense itself—given the quantity of purported drugs involved—mandated a minimum mandatory ten year sentence without possibility of downward departure. 21 U.S.C. § 841(b) (1988).

Not to worry, said the government, promptly moving to dismiss the indictment and substitute therefor an information which alleged a reduced offense consonant with a three year sentence.[7] The Court

7. "Critics of federal sentencing reform have suggested that it has not eliminated discretion, but has only shifted it from the judge to the prosecutor. *See, e.g.,* Alschuler, *The Failure of Sentencing Guidelines: A Plea for Less Aggregation,* 58 U.Chi.L.Rev. 901 (1991); Heaney, *The Reality of Guidelines Sentencing: No End to Disparity,* 28 Am.Crim.L.Rev. 161 (1991)." Paul J. Hofer, *Plea Agreements, Judicial Discretion, and Sentencing Goals,* 3 F.J.C. Directions 1, 11 n. 1 (1992) (footnote inserted as text).

While it appears that the government here was initially interested in securing Osseiran's guilty plea in order to remove him from the case and later acted to dismiss the indictment specifically to perform the plea bargain, the observations of Francesca D. Bowman, Deputy Chief Probation Officer, District of Massachusetts, concerning the report of the United States Sentencing Commission relative to mandatory minimum sentences, U.S. Sentencing Commission, *Mandatory Minimum Penalties in the Federal Criminal Justice System* (Aug. 1991), are possibly germane:

Not only are mandatory minimums applied disparately, they are also applied in a racially discriminating manner. The findings show that whites are more likely than non-whites to be sentenced below the mandatory minimum applicable. Furthermore, depending on which circuit is involved, mandatory minimums are more or less likely to be meted out. For instance, it was more likely for an individual defendant to have received the full force of the mandatory minimum in the 1st, 8th, 11th and D.C. circuits than in any others. (The study does not show any correlation between the racial factor and the circuit variation factor.)

Of interest to us in studying circuit variations is the fact that the D.C. Circuit and the 1st Circuit "have the highest rate of charging statutes mandating the highest minimum sentence." That means these two circuits are quick to initially charge defendants with the highest mandatory sentences available to them.

. . . .

Among the more disconcerting findings— the street level distributor is more likely than any other group to be sentenced at or above the mandatory minimum. The defendant with a peripheral role (girlfriend, spouse or courier with little knowledge) is least likely to be sentenced at or above the mandatory minimum. But the distributor/importer with the highest culpability level and the distributor/importer with the next highest culpability level is less likely to be sentenced at or above the mandatory minimums than the street level distributor. "Of greatest importance to the disparity issue, however, is the fact that 30 to 40 percent of those in higher roles received sentences lower than warranted by statutory criteria of drug amount and/or weapons use," the study said.

The reason is simple: "The street level distributors are less likely to receive downward departures than defendants in either lower or higher roles," the report says. This is so, we believe, because the street level distributor has less knowledge of the overall operation and cannot meet the standards required by statute for the downward departure, no matter how willing. It is only the managers/supervisors who have the information to provide for the government's prosecution of other defendants. The peripheral role defendants probably receive a lower sentence because they deserve less.

Compounding the disparity the Commission found:

A greater proportion of black defendants received sentences at or above the indicated statutory minimum (67.7 percent) followed by Hispanics (57.1 percent) and whites (54.0 percent). Reviewing case tracking in Tables 23 and 24 shows that a greater proportion of Hispanics and a lesser proportion of whites are originally indicted at the indicated mandatory minimum level. Whites are more likely to plead guilty, and less likely to be convicted at their indicated statutory minimum level.

Downward departures are most frequently granted to whites and least frequently to Hispanics. (Footnote 123 states: "It should be noted that this relationship might simply be a

allowed this motion, took Osseiran's plea to the information, and ultimately sentenced him to a term of three years.[8]

### B. *Post–Trial Proceedings: Fisher*

■ As noted above, on October 16, 1990, Fisher was convicted by the jury of two counts—*viz.* first, of attempting, and second, of conspiring, to possess cocaine with the intent to distribute it. This Court revoked Fisher's bail and ordered him taken into custody. Fisher thereupon fired his trial counsel and hired his present counsel whom the Court will refer to as appellate counsel. Appellate counsel promptly filed a variety of motions attacking the verdict, each of which the Court denied. Thereafter, the Court sentenced Fisher to concurrent ten year terms of imprisonment on the two charges.[9]

On June 3, 1991, Fisher filed this habeas corpus petition pursuant to 28 U.S.C. § 2255 (1988). Fisher argues that, in violation of his right to due process, he received ineffective assistance of counsel throughout the trial at which he was convicted. Fisher asserts that his trial attorney was

---

function of the difference in the willingness to cooperate by different race/ethnic groups; or, in the worst case, it might reflect racial bias.)" (sic)
Francesca D. Bowman, *[U.S. Sentencing] Commission, Congress Taking Disparate Paths,* 20 M.L.W. 1699, 1712–13 (May 18, 1992).

8. The Court recognizes its complicity in this questionable maneuver, having allowed the motion to dismiss the original indictment and having imposed sentence upon the reduced charge in accordance with the government's recommendation. The full exposition of what was actually going on is necessitated in light of the sentence ultimately imposed on Fisher.

Plea agreements that limit defendants' exposure to punishment to levels below the statutory penalties for their actual crimes appear to remain common. *See* Mandatory Minimum Penalties in the Federal Criminal Justice System 56 (U.S. Sentencing Commission, August 1991) (in 35% of cases where available data suggested that a crime carrying a mandatory minimum applied, defendants were permitted to plead guilty to lesser counts). Similarly situated defendants do not always get equivalent plea bargains.

Hofer, *supra,* at 2–3, 11 n. 5 (footnote inserted as text).

[I]t is clear from the available evidence that problems arose in a substantial proportion of early cases [under the sentencing guidelines] and are likely to be continuing. *See* Schulhofer & Nagel, *Negotiated Pleas Under the Federal Sentencing Guidelines: The First Fifteen Months,* 27 Am.Crim.L.Rev. 231 (1989) (finding "substantial number" of plea agreements that avoid otherwise applicable guidelines and are not "by-the-book"; Nagel and Schulhofer are completing an update of their research that confirms this finding); Alschuler & Schulhofer, *Judicial Impressions of the Sentencing Guidelines,* 2 Fed.Sentencing Rep. 94 [1989] (judges report seeing plea agreements that include fact bargains or call for dismissal of readily provable charges).

*Id.* at 2, 11 n. 4 (footnote inserted as text). Even so, "[i]n a recent informal survey of district judges in two circuits, approximately one-third said they had never rejected a plea agreement in a guidelines case. Another half said they had done so less than 10% of the time." *Id.* at 11 n. 10.

One reason for the failure of the Sentencing Guidelines to accomplish their legislatively mandated goals lies in the now endemic failure of the executive promptly to fill judicial vacancies.

Of thirteen authorized positions for United States District Judges in this district, four are vacant. The nine judges located in Boston are assigned the caseload for twelve of these positions. Today, every fourth case assigned to each judge is already beyond the load that judge would have if the court were at the strength determined by statute to be appropriate for the administration of justice in that district.

*Inmates of Suffolk County Jail v. Kearney,* 788 F.Supp. 623, 625 (D.Mass.1992).

9. This sentence represents a downward departure from the minimum 151 month term the Court found required by the Sentencing Guidelines (Disposition Tr., March 29, 1991, at 47) to the minimum mandatory sentence required by law. 21 U.S.C. §§ 841(b), 846; (Disposition Tr. March 29, 1991, at 59–62). This Court recognizes that, despite the avowed purpose of the Sentencing Guidelines to avoid disparities in the sentences imposed on similarly-situated defendants, U.S.S.G. Ch. 1, Pt. A, Introduction 3; *e.g., United States v. Williams,* 891 F.2d 962, 963, 967 (1st Cir.1989), proportionality in sentencing such defendants is, somewhat incongruously, *not* a ground for a downward departure, *e.g., United States v. Carr,* 932 F.2d 67, 173 (1st Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 112, 116 L.Ed.2d 82 (1991). Here, the government's shenanigans in bargaining Osseiran out of the case and then substituting charges in order to specifically perform a bargain that would otherwise be wholly unlawful is such singularly unique conduct as to warrant the downward departure ordered by the Court as to Fisher. *See* U.S.S.G. § 5K2.0. It appears that the government has not appealed Fisher's sentence.

ineffective because he failed to raise several motions on Fisher's behalf. Fisher simultaneously moved the First Circuit to stay his earlier filed appeal. The First Circuit granted the stay to allow this Court to consider Fisher's habeas corpus petition. Despite the government's motion to revise this order, arguing that the First Circuit and not this Court is the appropriate forum to consider Fisher's ineffective assistance claim, the stay remains in effect today. The First Circuit, therefore, is awaiting this Court's ruling on Fisher's habeas petition before proceeding with his appeal.

In opposing Fisher's petition, the government continues to assert that the First Circuit, rather than this Court, is the proper forum to hear his ineffective assistance of counsel claim. The First Circuit, though cognizant of the ineffective assistance of counsel claim that provides the basis for Fisher's section 2255 motion,[10] apparently expects this Court to consider Fisher's motion in the first instance. This Court thus interprets the First Circuit's stay order as permitting this Court first to decide which court should resolve Fisher's ineffective assistance of counsel claim.

■ In the vast majority of ineffective assistance of counsel claims, the trial record is an inadequate vehicle to resolve such a claim. *United States v. Austin,* 948 F.2d 783, 785 (1st Cir.1991). In those circumstances, a habeas corpus petition in the trial court is the proper manner to bring the claim in the first instance. *United States v. Hart,* 933 F.2d 80, 82 (1st Cir. 1991). In fact, the First Circuit has refused to consider ineffective assistance of counsel claims that have not been raised initially at the trial court level. *See United States v. Arango–Echeberry,* 927 F.2d 35, 39 (1st Cir.1991).

There are three primary reasons for the First Circuit's steadfast rule that a claim of ineffective assistance of counsel will not ordinarily be determined on direct appeal when the claim has not been raised in the district court. First, the judge who presided over the trial is generally in the best position to evaluate the effectiveness of counsel. *Id.* Second, judicial economy requires presenting the claim to the trial court in the first instance. *United States v. Hoyos–Medina,* 878 F.2d 21, 22 (1st Cir. 1989). Third, a claim of ineffectiveness generally necessitates further factual inquires which are best handled at the trial level. *Arango–Echeberry,* 927 F.2d at 39.

■ In determining which court should consider Fisher's claim for ineffective assistance of counsel, the critical question is whether the issues raised by the claim are questions of law or fact. If the unresolved issues are questions of fact, then the trial court is the appropriate forum to resolve them, because the trial record is insufficient to allow the First Circuit to do so. If, on the other hand, the issues are essentially questions of law, then the material found within the four corners of the trial record ought be adequate, and the First Circuit is the proper forum in the first instance. As the First Circuit has explained in justifying its consideration of an ineffective assistance of counsel claim, "the Appellant's claim is confined to matters found in the record and can be determined without the need for additional fact finding." *Austin,* 948 F.2d at 785; *see also United States v. Caggiano,* 899 F.2d 99, 100 (1st Cir.1990) ("[T]he defendant's ineffective assistance claim is confined to matters found in the trial record and in an affidavit.... Since there is no need for additional fact finding, the issue is properly before us on direct appeal.").

In the instant case, Fisher has articulated seven grounds for his claim of ineffective assistance of counsel: (1) failure to challenge the indictment as it was drafted; (2) inappropriate joinder of counts and defendants; (3) failure adequately to move for a severance of Fisher's trial from Osseiran's; (4) failure to object to the "constructive amendment" of the indictment; (5) failure to move for a mistrial after Osseiran pled guilty; (6) failure to move to strike certain evidence offered against codefendant Osseiran, or at least to seek a

---

**10.** The government submitted a copy of Fisher's section 2255 petition to the First Circuit as an exhibit to the government's motion to revise the stay.

limiting instruction pertaining to such evidence; and (7) failure to object to portions of the prosecutor's closing argument. Since the appropriate forum for Fisher's claim turns on whether resolving any one of these issues is possible on the basis of the trial record, this Court must first consider just what it is that constitutes ineffective assistance of counsel as matter of constitutional law.

Under the two-prong test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), trial counsel's representation must be both deficient and prejudicial in order to violate the Sixth Amendment. *Hart*, 933 F.2d at 82–83. In other words, the defendant must demonstrate both "his attorney's failure to meet this objective standard of reasonableness" and " 'that but for this ineffective assistance the outcome of the trial would have been different.' " *Id.* (quoting *United States v. Carbone*, 880 F.2d 1500, 1501 [1st Cir.1889], *cert. denied*, 493 U.S. 1078, 110 S.Ct. 1131, 107 L.Ed.2d 1037 [1990]); *see also Caggiano*, 899 F.2d at 101–02.

Because Fisher must satisfy both prongs of the *Strickland* analysis, a court must evaluate whether the failure of trial counsel to make certain motions was in fact prejudicial. *See Caggiano*, 899 F.2d at 104. In order to make this assessment, the court needs to ascertain whether the motions which appellate counsel now says were necessary would have been granted or denied had they been made by trial counsel. If this Court would have denied each such motion, then Fisher suffered no prejudice.

This, then, is the nub of the issue. The trial record is more than sufficient to evaluate the conduct of trial counsel. The only gaps in it are the views of this Court upon motions never made at trial. No evidentiary hearing is required to fill these gaps since this Court is fully cognizant of the entire pre-trial and trial record. As this Court conceives its duty under these circumstances, therefore, it is now to evaluate the motions appellate counsel says ought have been made at trial and, if Fisher would have benefited from the rulings thereon, to go on to evaluate Fisher's claim of ineffective assistance of counsel.

■ A major, indeed the virtually dispositive factor in this Court's analysis in ruling on the seven motions that appellate counsel now says ought have been raised during Fisher's trial is the scope of the conspiracy in which Fisher was a co-conspirator. This Court's understanding of this scope is the linchpin of its resolution of these motions, because the breadth and size of a conspiracy influence the admissibility of evidence. *See United States v. Arruda*, 715 F.2d 671, 678–79 (1st Cir. 1983). If, for instance, there was one large conspiracy, then all of the evidence introduced prior to Osseiran's plea was properly considered against Fisher, even after Osseiran's plea.[11] On the other hand, if there had been one primary hub conspiracy involving Osseiran, Malik, and others with a smaller spoke conspiracy involving Osseiran and Fisher, then only a portion of the evidence of the hub conspiracy (the portion to which the spoke is attached, to complete the metaphor) would have been admissible against Fisher. For a discussion of the trial management of a hub and spokes conspiracy trial, see *United States v. Doherty*, 867 F.2d 47, 63–64 (1st Cir.), *cert. denied*, 492 U.S. 918, 109 S.Ct. 3243, 106 L.Ed.2d 590 (1989).

■ In general, the jury must decide, as a question of fact, whether the evidence presented at trial suggests the existence of a single conspiracy, multiple conspiracies, or no conspiracy. *United*

11. The jury had already been instructed, before Osseiran's plea, to consider certain evidence against Osseiran only. Regardless of the scope of the conspiracy, therefore, this evidence should not have been considered against Fisher either before or after Osseiran's plea. After Osseiran pled guilty, this Court reminded the jury of its earlier limiting instruction: "[T]he questions that Mr. Egbert has asked on behalf of Mr. Osseiran and the data that he's elicited, you can consider. The only thing that you can now forget are those things where I told you this particular evidence pertains only to Mr. Osseiran. Now, where I told you that, now forget that part. Because the case as to Mr. Osseiran has been resolved." (Trial Tr., October 10, 1990, Vol. 14, at 44.)

States v. David, 940 F.2d 722, 732 (1st Cir.), cert. denied, —— U.S. ——, 112 S.Ct. 605, 116 L.Ed.2d 628 (1991); United States v. Boylan, 898 F.2d 230, 243 (1st Cir.), cert. denied, —— U.S. ——, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990). The jury's determination of the existence of such a conspiracy is reviewed only for "evidentiary sufficiency," provided that the jury received proper instructions from the court. David, 940 F.2d at 732.

█ To reach the conclusion that there was a single conspiracy, the evidence need not demonstrate that each co-conspirator knew every detail of the conspiracy, or even that each conspirator knew every other co-conspirator. United States v. Garcia–Rosa, 876 F.2d 209, 223 (1st Cir.1989), cert. denied, 493 U.S. 1030, 110 S.Ct. 742, 107 L.Ed.2d 760, and vacated on other grounds sub nom. Rivera–Feliciano v. United States, —— U.S. ——, 111 S.Ct. 377, 112 L.Ed.2d 391 (1990). "The fact that every defendant did not participate in every transaction necessary to fulfill the aim of their agreement does not transform a continuing plan into multiple conspiracies." United States v. Drougas, 748 F.2d 8, 17 (1st Cir.1984). Rather, a single conspiracy is proved if the evidence sufficiently demonstrates "that all of the alleged co-conspirators directed their efforts towards the accomplishment of a common goal or overall plan." Id.

█ Subject to these same legal standards, the trial judge also plays a role. Specifically, the admission of the statement of a co-conspirator against a defendant pursuant to Fed.R.Evid. 801(d)(2)(E) requires a preliminary factual finding by the judge pursuant to Fed.R.Evid. 104(a) that the statement in question was, by a fair preponderance of the evidence, in fact made "during [the course of] and in furtherance of the conspiracy [with which the defendant is charged]." United States v. Pe-

trozziello, 548 F.2d 20, 22–23 (1st Cir.1977). In the First Circuit, this factual determination is made by the district judge at the close of evidence from both the government and the defendant upon the full record thus developed. United States v. Ciampaglia, 628 F.2d 632, 638 (1st Cir.), cert. denied, 449 U.S. 956, 101 S.Ct. 365, 66 L.Ed.2d 221 and 449 U.S. 1038, 101 S.Ct. 618, 66 L.Ed.2d 501 (1980).

This Court made such a finding herein, concluding that, as charged in the indictment, both Osseiran and Fisher were engaged in a single conspiracy to possess and distribute cocaine. (Trial Tr., October 10, 1990, Vol. 14, at 70.) While the Court's finding is conclusory in nature, it depended on subsidiary factual findings that, because cocaine is a controlled substance that is generally imported from abroad, a chain of conspirators is essential to its distribution. Fisher and Osseiran both functioned as links in this distribution chain. Moreover, the evidence presented relating specifically to heroin was properly considered against Fisher because Malik used the heroin to prove his own bona fides (the heroin was Malik's proof that he could provide Osseiran—and ultimately Fisher—with illicit drugs). After making these findings, this Court submitted the case to the jury, leaving it to consider all the essential facts, including the existence of the cocaine conspiracy and Fisher's involvement in it.[12] The jury then deliberated and returned its verdict—a verdict confirming that the evidence demonstrated the existence of a single conspiracy. In light of the Court's finding and the jury verdict, hindsight points to the denial of the motions Fisher now says ought have been advanced at trial.

### 1. Challenge to the Indictment.

█ Fisher asserts that trial counsel was ineffective in challenging the indict-

---

12. In pertinent part, the Court instructed the jury as follows concerning Fisher's involvement in the conspiracy: "The second thing the government has to prove is that ... Mr. Fisher was a member of the conspiracy.... The government has to prove beyond a reasonable doubt that Mr. Fisher had the intent to join the con-

spiracy charged and that he knowingly participated in the illegal ventures that were the object of the conspiracy charged. It's not necessary that each member of the conspiracy know the names, the identities or even how many other people are in the conspiracy." (Trial Tr., October 15, 1990, Vol. 15, at 67–68.)

ment because he failed to argue that the indictment was drafted in such a way as to permit admission of otherwise inadmissible evidence against Fisher. This argument is specious. The indictment is consistent with the single conspiracy theory. Any objections raised to the drafting of the indictment itself were foredoomed to failure.

2. Joinder.

■■■ Fisher argues that the legal representation of his trial counsel was constitutionally deficient because he failed to argue to this Court that he had been improperly joined with Osseiran for trial in violation of Fed.R.Crim.P. 8(a) and (b). The government maintains that the co-defendants and their offenses were properly joined since Osseiran and Fisher were co-conspirators who participated in the same series of acts or transactions. This Court shares the government's view and, accordingly, would have denied a motion based on either Rule 8(a) or Rule 8(b), if such motion had been raised.

■■■ "The government is entitled to charge and join parties on the basis of what it reasonably anticipates proving against all.". *United States v. Martinez,* 479 F.2d 824, 828 (1st Cir.1973). A "rational basis in fact," sufficient to justify joinder, must be evident from the face of the indictment. *Boylan,* 898 F.2d at 245. In general, where there are clear factual connections between the counts and the defendants, Rule 8(b) permits joinder because of the practical advantages of a joint trial. *Doherty,* 867 F.2d at 63.

■■■ Here, joinder of Fisher and Osseiran was certainly warranted. *See United States v. Santiago Barbosa,* 666 F.2d 704, 707–08 (1st Cir.1981) (Rule 8[b] joinder appropriate where seller of drugs was the same for two sales, though buyers in first sale were unconnected with buyers in second sale). A conspiracy count, firmly grounded in fact, can be a sufficient link between defendants and offenses to "tip[ ] the balance in favor of joinder." *Arruda,* 715 F.2d at 678. In this case, the single conspiracy engaged in by both co-defendants weighs heavily in favor of joinder

and this Court would have so ruled had joinder been challenged by trial counsel.

3. Severance.

Fisher maintains that he received ineffective assistance of counsel in that trial counsel filed an inadequate motion to sever. Trial counsel submitted a motion based on Fed.R.Crim.P. 14 requesting a severance due to inconsistent defenses in that Osseiran was expected to raise an entrapment defense. This Court denied the motion.

Severance is a matter within the trial judge's discretion, *Doherty,* 867 F.2d at 63, and the law in this Circuit is clear that " 'antagonistic defenses do not per se require severance, even if the defendants are hostile or attempt to cast the blame on each other.' " *Arruda,* 715 F.2d at 679 (quoting *United States v. Talavera,* 668 F.2d 625, 630 [1st Cir.], *cert. denied,* 456 U.S. 978, 102 S.Ct. 2245, 72 L.Ed.2d 853 [1982] ). The First Circuit has explained that "[a]ntagonism of defenses requires severance only where the defenses are so inconsistent that the jury would have to believe one defendant at the expense of the other." *Id.* It is difficult to see how even an "expanded" motion for severance would have succeeded.

4. Constructive Amendment.

■■■ "A constructive amendment 'occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecution or court after the grand jury has last passed on them.' " *United States v. Maling,* 737 F.Supp. 684, 689 (D.Mass.1990) (quoting *United States v. Dunn,* 758 F.2d 30, 35 [1st Cir.1985] ), *aff'd sub nom. United States v. Richard,* 943 F.2d 115 (1st Cir.1991). An amendment to an indictment is considered "prejudicial per se." *Dunn,* 758 F.2d at 35.

In order to prevail on a claim that there has been a constructive amendment, the defendant must show that

his fifth and sixth amendment rights have been infringed. The fifth amendment requires that a defendant be tried only on a charge made by the grand

jury.... The sixth amendment working in tandem with the fifth amendment, requires that the defendant "be informed of the nature and cause of the accusation." U.S.Const. amend. VI. [Footnote omitted]

*United States v. Medina,* 761 F.2d 12, 16 (1st Cir.1985) (quoting *United States v. Kelly,* 722 F.2d 873, 876 [1st Cir.1983], *cert. denied,* 465 U.S. 1070, 104 S.Ct. 1425, 79 L.Ed.2d 749 [1984] ). Fisher's assertion that the government caused a constructive amendment of the indictment is to be treated seriously, given the "strong Fifth and Sixth Amendment guarantees that are implicated." *United States v. McKenna,* 889 F.2d 1168, 1173 (1st Cir.1989). There are three primary harms sought to be avoided by the prohibition against constructive amendments: "trial on a charge different from that found by the grand jury, the failure to inform the defendant of the nature and cause of the accusation, and a potential double jeopardy violation." *United States v. King,* 827 F.2d 864, 866 (1st Cir.1987).

▄▄▄ The indictment in this case charged that Fisher attempted and conspired to possess cocaine with the intent to distribute it, in violation of 21 U.S.C. § 846. Of the three harms sought to be avoided by banning constructive amendments, none is implicated by the facts before this Court. The government did not attempt to prosecute Fisher for any crime not explicitly mentioned in the indictment. Although Fisher claims that the prosecutor caused a constructive amendment by emphasizing Osseiran's involvement in the heroin transactions with Malik, this Court has already explained that one such transaction served to establish Malik's bona fides, *see supra,* p. 26, and found as part of the general *Petrozziello–Ciampaglia* ruling made during the trial that the Osseiran–Malik discussions concerning the composition of the illicit drug shipment were part of an overall drug conspiracy that included Fisher as a link in the chain of distribution. Accordingly, any claim of constructive amendment would have been futile.

5. The Mistrial Motion.

▄▄▄ Fisher argues that he suffered prejudice when trial counsel failed to move for a mistrial after Osseiran pled guilty midway through the trial. The decision to grant a mistrial is a matter within the sound discretion of the trial court. *United States v. Nimrod,* 940 F.2d 1186, 1188 (8th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 986, 117 L.Ed.2d 148 (1992). A trial judge also has discretion to determine whether a cautionary instruction, rather than a mistrial, can sufficiently protect the defendant from prejudice. *United States v. Ferguson,* 935 F.2d 1518, 1527 (7th Cir. 1991). The ruling on such a matter is generally reversed only for an abuse of discretion. *United States v. Beal,* 940 F.2d 1159, 1161 (8th Cir.1991); *United States v. Moore,* 917 F.2d 215, 220 (6th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1590, 113 L.Ed.2d 654 (1991).

▄▄▄ This Court carefully guarded against the possibility of prejudice potentially caused by Osseiran's absence by instructing the jury not to speculate about the matter. The Court issued the following instruction when the jury returned to the courtroom after Osseiran had pled guilty:

I can announce to you that the case as to Mr. Osseiran has been resolved. It's been concluded.... The government's case as to Mr. Fisher remains before you.... It's not any part of your function to speculate about how [Mr. Osseiran's case] has been resolved. It's sufficient that we're just not going to ask you for a verdict with respect to Mr. Osseiran because that part of the case has been resolved.

(Trial Tr., October 10, 1990, Vol. 14, at 44.) The use of this kind of jury instruction has been approved by the First, Second, and Fifth Circuit Courts of Appeals. *See e.g., United States v. Del Carmen Ramirez,* 823 F.2d 1, 3 (1st Cir.1987); *United States v. Gibbons,* 602 F.2d 1044, 1048 (2d Cir.), *cert. denied,* 444 U.S. 950, 100 S.Ct. 421, 62 L.Ed.2d 319 (1979); *United States v. Beasley,* 519 F.2d 233, 239 (5th Cir.1975), *vacated on other grounds,* 425 U.S. 956, 96 S.Ct. 1736, 48 L.Ed.2d 201 (1976). The critical

element of such a jury instruction is the court's instruction that the jury must not speculate about the reduction in the number of defendants. *See United States v. McCambridge*, 551 F.2d 865, 872 (1st Cir. 1977). Other courts have even condoned a trial judge's instruction which informed the jury that a co-defendant had pled guilty so long as an appropriate cautionary instruction was given. *See United States v. Earley*, 482 F.2d 53, 58 (10th Cir.), *cert. denied*, 414 U.S. 1111, 94 S.Ct. 841, 38 L.Ed.2d 738 (1973); *United States v. Jones*, 425 F.2d 1048, 1053–54 (9th Cir.), *cert. denied*, 400 U.S. 823, 91 S.Ct. 44, 27 L.Ed.2d 51 (1970).

■■■ Although it is undeniable that a potential for prejudice exists whenever a defendant pleads guilty mid-trial and leaves a co-defendant to continue, that potential can be overcome by issuing a jury instruction similar to the one given by this Court. In general, it is presumed that a jury has adhered to a court's cautionary instruction. *United States v. Mealy*, 851 F.2d 890, 903 (7th Cir.1988). For all these reasons, Osseiran's change of plea did not warrant a mistrial. *See Del Carmen Ramirez*, 823 F.2d at 3 (cautionary instruction adequate; change of plea did not create mistrial).

   6.  The Motions to Strike or Limit Evidence.

■■■ Fisher alleges that trial counsel should have moved, after Osseiran pled guilty, to strike the evidence that was admitted against Osseiran. He argues that the evidence should not have been admitted because it was irrelevant to Fisher's case. On this point, however, Fisher is wrong. Since there was but one large conspiracy, the statements of Osseiran and Malik were admissible pursuant to Fed.R.Evid. 801(d)(2)(E) and Osseiran's conduct was admissible pursuant to Fed.R.Evid. 402. Such evidence would not have been stricken even had such a motion been made.

   7.  Prosecutor's Closing Argument.

■■■ Fisher argues that trial counsel was ineffective when he failed to object in a timely fashion to portions of the prosecu-tor's closing argument. Specifically, Fisher focuses on the portions of the argument that pertained to Osseiran's heroin negotiations.

Once again, however, such an objection would have been futile. Due to the existence of one large conspiracy, the prosecutor was well within the bounds of propriety when she referred to Osseiran's involvement with heroin. Any objection on this ground would have been overruled.

### C.  Conclusion

Having articulated the Court's position with respect to each of the matters Fisher claims should have been raised by trial counsel, the trial record is now complete. Accordingly, while it appears that Fisher suffered no prejudice from the alleged defaults of trial counsel, it likewise appears that this Court is now without subject matter jurisdiction so to declare, as this case is presently on appeal to the First Circuit. *See supra* pp. 18–19. This Court thus respectfully conceives it to be its duty to close this opinion without formally ruling on Fisher's habeas petition. Should this be too cramped a construction of the intentions of the Court of Appeals implicit in its stay of the appeal, this Court will rule on the habeas petition forthwith and the appeal therefrom may be joined with the appeal of the judgment resulting from the jury verdict.